Rex *vs.* Joseph Booth.

## SUPREME COURT—IN BANCO.

### JANUARY TERM, 1863.

### REX *vs.* JOSEPH BOOTH.

THE law prohibiting the sale of intoxicating drinks to natives of this Kingdom, contained in Section 1, Chapter 42d of the Penal Code, held to be constitutional and in accordance with the policy of Hawaiian legislation from the earliest foundation of the present system of Government.

Likewise that the law does not contravene the obligations entered into by the Government in its treaty stipulations with foreign powers.

Judgment of the full Court, per ROBERTSON, J.

The defendant is charged with having violated Section 1st, Chapter 42d of the Penal Code, and pleads not guilty. He admits that on the 29th October, 1862, he sold imported spirituous liquors to natives of this Kingdom, in the town of Honolulu.

It is admitted on the part of the Crown that defendant is a British subject, licensed to sell liquors under the Act of 23d August, 1862, and that he is an importer of spirituous liquors.

The appeal to this Court from the decision of the Court below has been taken purely upon points of law, which have been submitted by defendant's counsel with much labor and care, in a printed brief of great length, accompanied and enforced by oral argument.

Upon examination, I think the numerous points made by the defense, may be comprised in a few general grounds which will embrace the whole subject. In giving my opinion upon the case, therefore, I do not propose to take up the points of defendant's brief *seriatim*, but to advert, in what seems to be the most natural and convenient order, to the general grounds which seem to me to comprise the whole defense.

And first, it is argued that Section 1st, Chapter 42d of the Penal Code, under which the defendant is charged, has been repealed, by implication, through the enactment of subsequent statutes. I shall not now take notice of the argument that the part of the Penal Code referred to was repealed by the 103d

Article of the Constitution, because that point seems to be comprised in the general ground of unconstitutionality, relied upon by defendant. But it is contended that Section 1st, Chapter 42d of the Penal Code, which prohibits the sale of spirituous liquors, by any person, to a native of the Kingdom, is radically inconsistent with the provisions of the Act of the 23d August, 1862, regulating the sale of spirituous liquors, and under which the defendant obtained his license. It is argued that the later enactment embraces fully the subject matter of the former, which has thereby become superseded.

Against this proposition the Attorney General cites the case of Rex *vs.* Elia, decided at the July term, 1861. In that case the defendant was indicted before the Circuit Court at Kauai for having sold spirituous liquors without license, in contravention of the law of 1846, which regulated the sale of spirituous liquors, previous to the enactment of the statute of 1862. The prosecution proved that the defendant, who was not licensed, had sold spirituous liquors to natives, and his counsel moved the Court to dismiss the case, on the ground that defendant could only be prosecuted under Section 1st, Chapter 42d of the Penal Code. The Circuit Court overruled the motion, and on appeal to this Court, the judgment of the lower Court was affirmed, on the ground that both statutes were in force, and the District Attorney might elect to prosecute the defendant under either the one or the other. In my opinion, the decision of the Court in Rex *vs.* Elia was sound, for the reasons stated at the time, and as the statute of 1862 has merely taken the place of that of 1844, as a law to regulate the vending of spirituous liquors as a branch of internal commerce, the provisions of that statute do not amount to an implied repeal of Section 1st, Chapter 42d of the Penal Code, which is a special penal enactment for the suppression of drunkenness among the natives. How can the statute of 1862 be said to embrace the subject matter of Section 1, Chapter 42 of the Penal Code, when that statute, as the defendant contends, contains no provision whatever touching the selling of liquors to natives? The later statute could only have embraced the matter of the former either by expressly repealing, modifying, or re-enacting the penal provision. The penal law is left untouched; for the mere silence of the statute

of 1862 on the subject matter of the penal law, cannot affect that law. The penal statute being still in force, I presume the Legislature deemed it unnecessary to repeat, in the Revenue Law of 1862, the general prohibition against the sale of liquors to natives ; but the subject is guarded with great care, by requiring the insertion in the vender's bond of a condition, subjecting him to its penalty in case he violates any law of the Kingdom. As both statutes are alive and in full force, the vender, by subjecting himself to the particular liability of his class, under the Revenue Law, does not become released from the ordinary liability which presses upon all men, under the provisions of the penal law ; so that in case of his infraction of that law, he may, at the option of the Government, be prosecuted either criminally, under the Penal Code, or upon his bond, under the Revenue Law.

The defendant argues further, that, under the law of 1862, licenses to sell spirituous liquors may be granted to natives, and that as a native vender would be prevented by Section 1, Chapter 42 of the Penal Code, from purchasing liquors to sell again, the provision of the Penal Code is radically inconsistent with the law of 1862, and the former law must therefore be regarded as repealed by implication. But the passage of the statute of 1862 has made no change in the law touching this subject. What is now set up as a radical inconsistency between the Penal Code and the Act of 1862, equally existed in the provisions of the License Law of 1846, which while it did not prohibit the granting of licenses to native subjects, did expressly forbid all venders from selling to natives. The statute of 1851 is the same ; and the law of 1862, while it does not prohibit the granting of licenses to natives, does prohibit venders from selling to natives, by binding them not to violate any law of the land in the exercise of their trade. The argument, then, amounts to this, that the provisions of the license laws are in themselves radically inconsistent, and that therefore the prohibition against selling to natives is void. But this is not sound. The circumstance that, under the law as it stands, a native vender would labor under the disadvantage or inconvenience of having to import his liquors, is accidental, or at least but an indirect consequence of the law. I see no inconsistency in the provisions of the law

which, while it grants the privilege of vending liquors to any one who fulfills certain requirements, and binds himself to comply with certain conditions, prohibits, as one of those conditions, the selling of liquors to native subjects. The point involved in this argument is merely a branch of the larger argument against the constitutionality of the statutory prohibition; for unless the Legislature has exceeded its power in enacting that prohibition, any indirect disadvantage that may arise thence to individuals amounts to nothing. Again the license laws, which regulate any particular branch of internal traffic, must be viewed as in subordination to a general law of the land. The general law, contained in the Penal Code, says that no person whatever shall sell spirituous liquors to a native subject; and unless the license law, which is a particular law, contains a provision amounting to an express declaration that venders may sell to native subjects, the two laws cannot be deemed radically inconsistent. If such a provision existed, the particular law would prevail over the general; but the permission to sell liquors to natives cannot now, in the face of a positive prohibition, be given by, or derived from, negative implication.

But the defendant contends that Section 1, Chapter 42 of the Penal Code is inconsistent, illogical, contradictory and absurd upon its face, and therefore void. That section reads as follows:

" Whoever shall sell, give, purchase, or procure for, and in behalf of any native of this Kingdom, or for his use, any spirituous liquor, or other intoxicating drink or substance, shall be punished by a fine not exceeding two hundred dollars; and in default of the payment of such fine, by imprisonment at hard labor for a term not exceeding two years."

It is argued that, because the proposition *to* is not used after the verbs *sell* and *give*, that those verbs must be connected with the preposition *for*, and the statute read so as to prohibit only the selling, giving, purchasing or procuring *for* a native, but not the selling or giving *to* him. This is certainly a strained, and hypercritical reading of the language of the statute. The meaning of that language when read and construed in the ordinary manner, is so obvious that I am surprised at the amount of labor and ingenuity expended by counsel in the en-

deavor to build up a construction which, upon examination, will be found to destroy itself, by rendering the law almost nugatory in practice ; and no Court will adopt such a construction when the language of the statute is plainly susceptible of one that will give effect to the avowed purpose of the lawmakers, and the declared object of the law. Did the words used by the Legislature, when construed according to their natural sense and the connection in which they stand, result in an absurdity, and fail to effect the declared object of the law, it would not be within the province of the Court, by supplying words which the Legislature had not used, to obviate that absurdity and effectuate the supposed intention of the law-makers. They must use language themselves susceptible of such a construction as will express their intention, or that intention can not be enforced. But where the Legislature has used language which is susceptible of two reasonable constructions, one of which would defeat the declared object of the law, while the other would effectuate that object, it is the duty of the Courts to adopt the latter, for that must be presumed to convey the intention of the Legislature. I do not admit that the construction contended for on behalf of the defendant in this case, is reasonable or practicable, but merely to state what would be an obligatory rule upon the Court, even supposing the defendant to stand in so good a case. Again, admitting that the wording of the law might have been improved, or its meaning placed beyond the possibility of a doubt, by the use of the preposition *to*, that circumstance cannot be pressed beyond its legitimate weight. In the case of Bloxam *vs.* Elsee, 6 Barnwell & Cresswell, 174, the Court said : " The sense and spirit of an Act, however its scope and intention, are primarily to be regarded in the construction, and it matters not that the terms used by the Legislature in delivering its commands, are not the most *apt* to express its meaning, provided the object be plain and intelligible, and expressed with sufficient distinctness to enable the Judge to collect it from any part of the Act. The object once understood, Judges are to so construe the Act as to suppress the mischief and advance the remedy." In the case of Rex *vs.* Ramsgate, 6 Barnwell & Cresswell, 712, the Court held the following language : "When the Legislature has used words

of a plain and definite import, it would be very dangerous to put upon them a construction which would amount to holding that the Legislature did not mean what it has expressed."

The language of the statute before us is not ambiguous. The words used by the Legislature, taken in their usual signification and proper connection, express a clear and unmistakable meaning, thus : " Whoever shall sell any native of this Kingdom, or for his use, any spirituous liquor, etc.; whoever shall give any native of this Kingdom, or for his use, any spirituous liquor, etc.; whoever shall purchase or procure for and in behalf of any native of this Kingdom, or for his use, any spirituous liquor, etc., shall be punished by a fine," etc. ' I see no necessity for the use of the preposition *to* in order to make clear the intention of the Legislature to prohibit all persons from selling or giving spirituous liquors to any native, or for his use, and from purchasing or procuring for and in behalf of any native, or for his use, spirituous liquor. To conclude upon this point, let us look at the reading contended for by the defense : "Whoever shall sell for any native of this Kingdom, or for his use, any spirituous liquor, etc.; whoever shall give for any native of this Kingdom, or for his use, any spirituous liquor, etc.; whoever shall purchase or procure for and in behalf of any native of this Kingdom, or for his' use, any spirituous liquor," etc. I cannot hesitate for a moment to say that this construction seems to me altogether unreasonable, and that it must be rejected as unsound. But if any doubt can exist upon the construction of the English version of the statute, it is effectually set at rest by reference to the Hawaiian version, the language of which is so clear that the meaning cannot be misunderstood ; and although I merely refer to the latter version, in this case, for the purpose of a parallel reading, the Court, in case of an irreconcilable difference, would have to follow that version as the standard. (See Metcalf *vs.* Kahai, 1 Hawaiian Reports, 225 ; Hardy *vs.* Ruggles, *et als.*, ibid, 255.)

It is argued further, by defendant, that Section 1, Chapter 42d of the Penal Code is unjust and unreasonable in its consequences, and therefore void. I am unable to see the force of this point as stated, for the consequences of that Section are these : that if any person violates its provisions, whether he be

Rex *vs.* Joseph Booth.

a licensed vender or not, he subjects himself to a fine of not more than $200, or imprisonment for not longer than two years. If it is meant to be argued that it would be unjust and unreasonable to exact from any vender who may violate the law the penalty prescribed by the Penal Code, in addition to the penalty of his bond and the forfeiture of his license, under the license law, that is a matter with which the Court has nothing to do, even admitting that the several penalties could be legally exacted, upon which I do not venture any opinion. If counsel mean to say that the provisions of the Penal Code and of the license law, taken together, make an unjust and unreasonable law, because those provisions prescribe a much heavier and more severe punishment against any licensed vender who may sell spirituous liquor to natives, than against an unlicensed person who may commit the same offense, I must say that I do not perceive anything unjust or unreasonable in such a law. It is obvious that licensed venders possess in a hundred fold over unlicensed persons the facilities for a systematic violation of the prohibition, and that their temptations to do so are correspondingly great. It was reasonable, therefore, on the part of the Legislature, to adjust the penalties accordingly. It is the duty of the Legislature to affix such an amount of punishment to the commission of an offense, as will tend to deter men from such commission, and not to ascertain the maximum which offenders can afford to pay, and still go on violating the law. It is not for the Court to say, in any case, that the penalty is excessive and unreasonable, and that therefore the law is void. Take, for example, the offense of smuggling. For a single act of smuggling, however small the amount, a valuable ship may become forfeited to the Government; but an argument in that case, that the punishment was unreasonable, and therefore the Court should hold the law to be void, would deserve no attention.

The next ground of defense to which I shall advert is, that the law prohibiting the sale of spirituous liquors to natives is in conflict with the provisions of Articles 2d and 10th of the treaty with France. By the 10th Article of that treaty, it was stipulated on the part of the Hawaiian Government, "that the importation and the sale of wines and brandies of French origin

Rex *vs.* Joseph Booth.

shall not be prohibited in the Hawaiian Islands." Article 2d, the principal end of which is to regulate the commercial and maritime intercourse of the respective subjects of the two Governments, contains, among other provisions, the following : " They shall have the right to buy and to sell of and to whom they please, without any monopoly, contract or exclusive privilege of sale or purchase, prejudicing or restricting in any manner whatever their liberty in this respect. They shall be equally free, in all their purchases as well as in all their sales, to fix the price of their goods, merchandise and objects of every kind, both imported and destined for importation, so long as they comply with the laws and regulations of the country."

Whatever privilege may be rightfully claimed by a French subject, under those provisions, may equally be claimed by the defendant, by virtue of the parity clause in the treaty with Great Britain. It is contended that the freedom of importation which is guaranteed by the treaty, carries with it, as a natural result, freedom of sale ; that as the importation cannot be prohibited by law, neither can the sale be prohibited, or even restricted in any degree ; that the words, " They shall have the right to buy and to sell of and to whom they please," must be taken without any qualification whatever, and extend the right of sale, which follows the right of importation, beyond the power of the slightest limitation or restriction, by municipal law ; and that, therefore, the law which prohibits the sale of spirituous liquors to natives is in direct violation of the treaty.

The language of the treaty is undeniably broad, and the words quoted, if taken by themselves, might be understood as sustaining the defendant's position; but I understand the general scope and intent of the second article, the whole of which should be read together, to be principally the securing for French subjects, residing in, or visiting this Kingdom, for purposes of trade or commerce, an equality of rights and privileges, in regard to such trade or commerce, with his Majesty's own subjects. That the Hawaiian Government has never understood the treaty stipulations referred to in the light now urged upon the Court by the defendant, is evident. The prohibitory law which is now sought to be overthrown, was in force for many years before the date of the French treaty, and if the provisions of that

treaty had been understood by his Majesty's Government as conflicting with so important a law, an immediate change must have followed. Yet three successive sessions of the Legislature have been held since that date, and the legislative body has not been called upon by the Executive to repeal the law in question, in order to give effect to the treaty. It is said that the Court has nothing to do with governmental policy. But this is not true to the extent which is claimed, for the Court is supposed to know, and bound to take notice of, the general policy of its own Government. The judicial recognition of that policy becomes necessary in many cases, as throwing light upon the meaning of statutes and treaties. In this case, it is clear that if the Hawaiian Government had ratified the provisions of the treaty, understanding them to mean what is now contended, a line of policy pursued ever since the recognition of Hawaiian Independence, must suddenly have been abandoned. But neither were those provisions so understood by the late Commissioner of France, who negotiated the treaty on behalf of his sovereign. It appears, by reference to the treaty and protocols, as printed by order of the King in Council (see page 76), that a suggestion having been made, in Privy Council, that the treaty "provided for the sale of intoxicating liquors to the King's native subjects, contrary to the Hawaiian municipal laws," the Commissioner solved that doubt, officially, as follows : " That it had never entered into the intention of France to interfere in the system of the Hawaiian laws which regulate the sale of liquors to the natives ; it is not the intention of France now. The object of the 10th Article is to protect foreigners, especially the French, against all systematic and absolute prohibition, and at the same time leaving to the Hawaiian Government every liberty in the internal regulation of that special commerce." So, then, it appears that the existing municipal laws are in conformity with his Majesty's treaty engagements, as mutually understood by the two Governments ; and this part of the defense must therefore fall to the ground.

The most important ground taken by counsel for the defendant, is the one which yet remains to be considered, namely, that the prohibitory law is in conflict with certain articles of the Constitution, and therefore void. The articles relied upon are the 1st, 14th and 62d, which read as follows :

Rex *vs.* Joseph Booth.

Article 1st. God hath created all men free and equal, and endowed them with certain inalienable rights, among which are life and liberty, the right of acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.

Article 14th. The King conducts his Government for the common good ; for the protection, safety, prosperity and happiness of his people, and not for the profit, honor, or private interest of any one man, family, or class of men among his subjects. Therefore, in making laws for the nation, regard shall be had to the protection, interests and welfare not only of the King, the chiefs and rulers, but of all the people alike.

Article 62d. Full power and authority are hereby given to said Legislature, from time to time, to make all manner of wholesome laws, either with penalties or without, as they shall judge to be for the welfare of the nation, and for the necessary support and defense of good government : Provided the same be not repugnant or contrary to this Constitution.

It is argued that Section 1, Chapter 42 of the Penal Code grants privileges and immunities to one class of citizens which it denies to others, under like circumstances. But this is an incorrect way of putting the case. The law referred to grants no privileges or immunities to any class. On the contrary, it is a prohibitory law, forbidding all men alike from selling or furnishing spirituous liquors to native subjects. The true mode of stating this point of the defense, it seems to me, is this : the object and effect of the prohibitory law being to prevent the sale of liquors to native subjects only, and not to all subjects alike, it is at variance with the spirit of the Constitution. This point, therefore, although stated separately by counsel, is comprised in the general ground, and will be covered as I proceed.

In the case of Rex *vs.* Sawyer, tried before this Court at the July term, 1859, the defendant was prosecuted under the statute prohibiting the manufacture of intoxicating liquors. One ground of defense relied upon in that case was, that the prohibitory law is repugnant to the 1st Article of the Constitution, and therefore void. The Court overruled that part of the defense; and I took occasion at that time to express my opinion that the 1st Article of the Constitution is to be regarded merely

Rex *vs.* Joseph Booth.

as a preface, announcing and recognizing, in general terms, political principles, touching the freedom, equality and common rights which lie at the foundation of every liberal, constitutional government, and upon which the Hawaiian Constitution is professedly based ; but that, in the application of those principles, the language in which they are declared is not to be understood in an absolute and unlimited sense.   That language must be interpreted, and the application of those principles must be controlled and regulated, by the succeeding provisions of the Constitution—by the expressed or clearly implied requirements, authorizations and limitations of the instrument, regarded as a whole.   The bare recognition of those principles is by itself of no practical value without their authoritative application, for, as remarked in the defendant's brief : " The ideas of natural, civil and equal rights are regulated by no fixed standard, and the ablest and purest men have differed upon the subject ;" and, in my opinion, the general principles may receive a wider interpretation and a more extended application, from one nation than from another, and yet both one and the other may with equal propriety be said to enjoy political and civil freedom, although in an unequal measure.   Those principles were not recognized here for the first time in the Constitution adopted in 1852.   They had previously been announced in the declaration of rights prefixed to the Constitution of 1840.   They were not embodied in the Constitution, but formed a part of the preface, and were properly styled sentiments, or principles, in general accordance with which the Government was to be conducted.   It is unnecessary to prove at length that those sentiments or principles have never been interpreted or deemed applicable in this Kingdom, in the unlimited sense contended for in the present case, and in the case of Rex *vs.* Sawyer.

But it is argued that the enactment of the law now under discussion is what is sometimes denominated class legislation; and that the power of class legislation, or making special laws, does not exist, in view of the provisions of Article 14th of the Constitution.   In the case of Naone *vs.* Thurston (Vol. 1 Hawaiian Rep., page 220,) the same ground was raised by defendant, in resistance to the law of 1851, imposing a special and distinct school-tax upon foreigners and subjects of foreign birth or pa

rentage. The Court held the law to be constitutional, and that the Hawaiian Legislature always had, and still has, the power of special legislation, at least in the matter of taxation.. That decision, however, cannot be regarded as conclusive in the present case, as it did not involve the question of equality as to civil rights and privileges, which is mainly relied upon in the present case, and therefore this ground of defense must be further examined.

It is important, therefore, to ascertain the true meaning and intent of the provisions of Article 14th of the Constitution, already quoted. It will be found that the principles embodied in that Article were, like those recognized in the 1st Article, a part of the declaration of rights prefixed to the Constitution of 1840. That declaration says, " God has also established government, and rule, for the purpose of peace ; but in making laws for the nation, it is by no means proper to enact laws for the protection of the rulers only, without also providing protection for their subjects ; neither is it proper to enact laws to enrich the chiefs only, without regard to enriching their subjects also ; and hereafter there shall by no means be any laws .enacted which are at' variance with what is above expressed." And, further on, under the head of " Protection for the People Declared," it says : " The above sentiments are hereby published for the purpose of protecting alike, both the people and the chiefs of all these islands, while they maintain a correct deportment; that no chief may be able to oppress any subject, but that chiefs and people may enjoy the same protection, under one and the same law. Protection is hereby secured to the persons of all the peeple, together with their lands, their building lots, and all their property, while they conform to the laws of the Kingdom, and nothing whatever shall be taken from any individual except by express provision of the laws." The provisions of Article 14th of the Constitution of 1852 are merely a reiteration of a portion of the " sentiments " expressed in the passage just quoted.

Now, under what circumstances, and in what sense, were these sentiments or principles declared and adopted by the rulers of this Kingdom? The history of the country, and the origin of the present form of Government, are familiar to the

Court, and have a proximate bearing upon this question ; for the Court is not bound to adopt the construction contended for by the defense, merely because general theory might give it a degree of countenance, independent of all practice and the prevailing understanding, since the foundation of the Government. The nation was emerging from its ancient state of absolute despotism, in which the rights of life, liberty and property, so far as the common people or serfs were concerned, were not only insecure, but not recognized as having any existence, beyond the capricious will of the chiefs. The Government, or rather the power to rule, was solely in the hands of the chiefs, who used that power, and ruled over the common people, entirely for their own benefit or aggrandizement. His late Majesty having resolved, with the concurrence of his high chiefs and councillors, to establish his Government upon just principles, granting to the people, equally with the chiefs, certain rights, to be held and enjoyed according to fixed laws, and not at the will of any superior lord, proclaimed the Constitution of 1840, and announced, in substance, the same sentiments and principles now to be found in the 1st and 14th Articles of the present Constitution. The voice of absolute authority decreed that, in future, the King would conduct his Government for the common good, and not for the honor, profit or private interest of any particular family, or of the ruling class ; and that in making laws for the nation, regard should be had to the protection, interest and welfare of the common people, equally with the King, chiefs and rulers. The controlling idea therefore is perfectly manifest, and the sense in which the language of the Constitution was used cannot be mistaken. Indeed, the form of expression used in the 14th Article scarcely admits of an argument. In that sense, and in that only, it is true that the Hawaiian Legislature has not the power of special legislation. With this reservation, it has that power, and may use it at its discretion, so long as the power is exercised in conformity with the letter and spirit of the 62d Article of the Constitution. But, says the defendant's counsel, "The nature and ends of legislative power limit the exercise of it; and there are certain vital principles in every constitutional Government which determine and overrule apparent and flagrant abuses of legislative

Rex *vs.* Joseph Booth.

power." This is emphatically sound. It is the very rule by which, as I understand it, I am endeavoring to test the validity of the law now under discussion, and by which the validity of every law upon the statute book is liable to be tried. Whenever it shall appear that the Hawaiian Legislature has clearly transcended its power, and committed any such abuse, this Court will administer the remedy. But to hold that Section 1, Chapter 42 of the Penal Code enhances the profit, honor, or private interest of any particular family, or of the higher classes only; or that it does not as much regard the protection, interest and welfare of the common people as of the chiefs and rulers, would be a perversion of the plain language and intent of the 14th Article of the Constitution; and the assertion that the law in question degrades his Majesty's native subjects to a condition of slavery or serfdom, is sheer extravagance, a total misapplication of terms.

The defendant's counsel admitted, in the course of his argument, that there is no provision in the Constitution which could prevent the Legislature from enacting a law to prohibit, entirely, the importation and sale of spirituous liquors within this Kingdom. In my opinion, this is true. But counsel went on to argue that because the Government has yielded, by the treaty stipulations already referred to, a part of the power of sovereignty, and can no longer prohibit the importation and sale of liquors by and to foreigners, that, therefore, the whole power is lost, and the Legislature can not enact a law to confine the traffic to foreigners, and prohibit the sale to natives. But is this logical? Because the exercise of the legislative power is restrained in part by treaty, does it follow that the power, so far as it is not affected by the treaty, may not still be exercised up to the limit allowed by the Constitution? I think not.

But it is contended that "It is an axiom in all constitutional Governments, that all legislative power emanates from the people; the Legislature acts by delegated authority, and only as the agent of the people;" that the Hawaiian Constitution was founded by the people; "that the Government of this Kingdom proceeds directly from the people, was ordained and established by the people," and that it is against all reason

and justice to suppose or presume for one moment, that the native subjects of this Kingdom ever entrusted the Legislature with the power to enact such a law as that under discussion.

Here is a grave mistake—a fundamental error—which is no doubt the source of much misconception. These ideas run through a large part of the case made by the defense, and much of the argument and reasoning predicated upon them, possesses no weight whatever. The Hawaiian Government was not established by the people; the Constitution did not emanate from them; they were not consulted in their aggregate capacity or in convention, and they had no direct voice in founding either the Government or the Constitution. King Kamehameha III. originally possessed, in his own person, all the attributes of absolute sovereignty. Of his own free will he granted the Constitution of 1840, as a boon to his country and people, establishing his Government upon a declared plan or system, having reference not only to the permanency of his Throne and Dynasty, but to the Government of his country according to fixed laws and civilized usage, in lieu of what may be styled the feudal, but chaotic and uncertain system, which previously prevailed. The recognition of his independence by the great powers of Christendom; the claims of commerce; the influx of foreigners, and the gradual advancement of his native subjects, rendered necessary still further changes. The Government had to be regularly organized, the different powers separated and defined, and the whole land system of the Kingdom to be remodelled. The first Constitution no longer furnished a sufficiently broad foundation. The King, by and with the advice and consent of the Nobles and the House of Representatives, voluntarily granted and proclaimed the present Constitution on the 14th of June, 1852. As before, the people at large were not consulted, and they performed no direct part in the adoption of the Constitution. That instrument was framed and sanctioned by the legislative body, consisting of the King, the House of Nobles and the House of Representatives, in whom, collectively, is now vested that supreme, absolute power of legislation, which was originally vested in the Monarch alone. Not a particle of power was derived from the people.

Rex *vs.* Joseph Booth.

Originally the attribute of the King alone, it is now the attribute of the King and of those whom, in granting the Constitution, he has voluntarily associated with himself in its exercise. No law can be enacted in the name, or by the authority of the people. The only share in the sovereignty possessed by the people, is the power to elect the members of the House of Representatives ; and the members of that House are not mere delegates. The several parts of the Legislative body, acting in unison, have power to change the form of Government, to amend and modify the Constitution, or to abrogate it entirely and adopt another, without ratification by the people at large, as they did in 1852 ; and they possess full power to enact all manner of wholesome laws, general or special, which in their wisdom they may deem conducive to that highest of all objects —the public weal, within the express restraints of the Constitution. They are limited to that extent, and no further, by the rules which they have prescribed for themselves.

It has not been argued, nor could it have been with propriety, that the law prohibiting the sale of spirituous liquors to natives is pernicious in its effects, or that it is not a wholesome law, within the meaning of the 62d Article of the Constitution; and there can be no question that it tends to promote the well-being of his Majesty's native subjects, and assists in promoting the material interests and general welfare of the nation at large. The subject of the importation and sale of spirituous liquors in this Kingdom, has always been treated by the Government as a specialty, and the traffic has ever been kept under stringent regulations. With the limitation resulting from the treaty engagements already spoken of, the Legislature has full power over this subject, and so long as the law makers deem it wise to maintain the prohibition, it is the imperative duty of executive and judicial officers to enforce it.

In my opinion, the judgment of the Police Justice should be affirmed.

---

ALLEN, C. J.

It is contended by the counsel for the respondent, that the law which is alleged to have been violated by him is unconstitutional and in derogation of the rights, privileges and immuni-

ties of native subjects. Questions which involve constitutional provisions, are always of the most grave and serious character, and should receive the most anxious consideration.

It is alleged that the Government, under the present Constitution, emanated directly from the people, and was ordained and established by them. It may be well for the full elucidation of the question involved, to review briefly the history of its formation. It is not necessary for this purpose to revert to the Government of these Islands prior to the time of Kamehameha I. The entire group were conquered by him, and he was the founder of the Kingdom, and all the lands belonged to him, a portion of which he divided, according to ancient usage, among his warrior chiefs, and they did the same to an inferior order of chiefs, by whom they were subdivided again and again ; but the title was in the King, and there was no one who could make a conveyance without his consent or direction. All persons in possession of lands, no matter whether chiefs or people, owed and paid a land tax, which the King assessed at pleasure ; and also he called for service at his discretion, on all grades, from the highest down. They also paid, in addition to the ·yearly taxes, some portion of the productions of the land. In addition, they owed obedience at all times. The treaty which was negotiated in 1836, between this Government, and Lord Edward Russell on behalf of the British Government, shows the views then entertained by the contracting parties. It is therein declared "that the land on which the houses were built is the property of the King." This sketch illustrates the nature of. the tenures, and the titles by which the lands were held. Land was the main property which gave authority. It was the only resource to support the retainers which were necessary to sustain the dignity of the King and his chiefs, and as the titles of all the lands were held by the King, it was literally true that the Kingdom was his. The Government was as exclusively in him as the titles to the lands were. When Kamehameha I. died, his will was : " The Kingdom is Liholiho's, and Kaahumanu is his Minister." In his time, "life and death, condemnation and acquittal," were in the hands of Kaahumanu, who was then, as declared in the first Constitution, the Premier of the Kingdom. This officer transacted· business under the authority of the King.

On the 8th of October 1840, Kamehameha III. granted to his people a Constitution, which on that day was agreed to by the Nobles, but it was then declared that "it should not be considered as finally established, until the people have generally heard it, and have appointed persons according to the provisions therein made, and they have given their assent by their Representatives, then this Constitution shall be considered as permanently established." This Constitution contained a declaration of rights. It declared, " God had bestowed certain rights alike on all men, and all chiefs, and all people, of all lands, and that some of the rights which God had given alike to every man and every chief of correct deportment, were life, limb, liberty, freedom from oppression ; the earnings of his hands and the productions of his mind, not however to those who act in violation of the laws." It secured protection to "the persons of all the people." It permanently confirms the Kingdom to Kamehameha III. and his heirs. A House of Representatives was established, and there were some salutary provisions of law contained in it not properly within the legitimate measures of a constitution. But probably for the day subserved their purposes. It will be seen that this Constitution was a grant from the King. Whatever power or rights which he alienated by this Constitution, was done from his own convictions of justice and of duty. The Constitution did not proceed from the people, neither was it ordained or established by them. From the consideration which he bore them, he declares to them, in the instrument itself, that it shall not be considered as finally established, until the people, by their Representatives, have assented to it. There is no place in this Kingdom made memorable like Runnymede, where the Barons of England compelled King John to grant Magna Charta. Neither the chiefs or people have ever compelled the Kamehamehas by the sword to grant them a constitution. It was a free will offering on the part of the King. It was regarded by him as a measure of wisdom to give strength to his Kingdom, symmetry to its laws and prosperity to his people. The first Constitution was limited in its provisions, and was thought not to answer fully the great purposes of such an instrument. In 1852, the same King which granted the Constitution of 1840, by and with the advice and consent of the

Rex *vs.* Joseph Booth.

Nobles and Representatives of the people in legislative council assembled, granted the Constitution which is now in force. Like the Constitution of 1840, it was a grant from the King himself, and not secured by any act of the people, other than the assent of their Representatives, which the King most graciously suggested as a matter proper for their consideration and for the expression of their wishes. The declaration of rights evinces enlarged " and liberal political views, and a determination to conduct his Government for the common good, and for the protection, safety, prosperity and happiness of his people." Although it is very evident that the Constitution was a grant from the King, and not coerced by the chiefs or people, still it was a grant made by their advice and consent. It has no less binding force than if it had been the result of a revolution, although between the parties to the instrument it would doubtless have less technical and exacting rules of construction than if won by the sword. In the one case it is a grant from personal feeling, and in the other a charter secured by force. It was made in the nature of a gift, designed with other purposes to protect them in their personal liberty, and in the enjoyment of the fruits of their labor. It was the virtual abolition of a system which resembled the feudal system of a portion of Europe, and which was never imposed on the foreigner here ; and while the Constitution amply secures him in all his rights, it was never designed to preclude the benefits and advantages of such legislation as the Hawaiians should regard as adapted to their peculiar condition ; always premising that it does not affect injuriously the rights of the foreigner. Most of the foreigners at the time of the adoption of the Constitution were under the protection of treaties and the law of nations.

The history of the Hawaiian Government and laws, prior and subsequent to the adoption of the Constitution, and the true meaning of the terms of the Constitution itself, fully sustain this construction.

The argument of counsel was very able and eloquent in its application to the rights of British subjects under the British Constitution, and to the rights of an American citizen under the Constitution of the United States, on the great principle

that laws should affect all people alike; but its fallacy consisted in its misapprehension of the true spirit, intent and purpose of the Hawaiian Constitution as applicable to Hawaiians. It is the great charter of the rights of the King, the chiefs and the people, for it has been so declared by mutual accord. But in giving a construction to its provisions, if there ever was an instance when the history of the grant and of the people, and the contemporaneous history of its laws, should have an influence in its construction it is unquestionably in this.

The Legislature of the Kingdom has always been peculiar in this, that it has made certain provisions of laws exclusively in reference to native subjects, since the formation of the Government.

For example, it has, by the law of 1846, interdicted the enlistment of natives as sailors on a foreign vessel without the compliance with certain requisitions, especially prescribed, and even then the power was placed in the hands of the Governor to grant or refuse the application for enlistment. A bond was required also to return the enlisted natives. By the Civil Code, a law similar in its provisions is re-enacted. The penalty is made higher by the last law. The master of the vessel is made liable to a penalty of five hundred dollars for taking a native out of the Kingdom, as a seaman or otherwise, without obtaining the consent of the Governor, and his vessel is liable to seizure, condemnation and sale to satisfy the same.

There are in force certain laws for the establishment of English schools for Hawaiian youth, on the several islands, at such places as are deemed most advantageous for extending a knowledge of the English language among the natives, and money is appropriated and expended for that specific purpose.

It is also made lawful for the Board of Education to establish family schools, for the domestic training of Hawaiian girls in which the English language shall be taught—and money is appropriated for this specific purpose.

The history of our whole legislation shows that many laws have been passed which applied to the native subjects exclusively. Laws similar in provision, and for the same object, applicable exclusively to the native race, have met the approval of the King, Nobles and the Representatives of the people, at

different periods since the year 1846, which is conclusive evidence that in their judgment the unrestricted use of spirituous liquors is dangerous in its consequences. For the good of the people, in their wisdom they have passed these laws. At any session of the Legislative Council they could have repealed them ; but they have not deemed it wise legislation to do so. At any future Legislature they can do it, if they feel assured that the health and life of the people will not be endangered.

In the 14th Article are these words : " In making laws for the nation, regard shall be had for the protection, interests and welfare, not only of the King, the chiefs and rulers, but of all the people alike." All the laws which have been passed, applicable exclusively to Hawaiians, are applicable to all Hawaiians alike; and because they do not embrace the foreigners, this constitutional question is raised. My own view is, that in forming the Constitution it was not the intention of the framers to prohibit legislation exclusively applicable to native subjects. Many of the men who were participants in framing the Constitution were members of the legislative councils which have passed this class of laws. The counsel have pictured much injury to the Hawaiian by this construction. All branches of the legislative council always have been Hawaiian, and two branches at least will be as long as this Constitution exists, and any laws which they pass apply alike to all Hawaiians, and of course, to themselves, and cannot conflict with any of their constitutional rights; hence it is that the native subject can be in no especial danger in his civil or political rights. While some laws have been enacted of a restrictive character, such as the law in question, the law of shipping native seamen, and of restraining natives from leaving the Islands without the Governor's consent, many provisions have been made especially for their benefit, to some of which I have already adverted. There can be no complaint of this construction from the foreigner, for whether a subject or not, the restricting laws do not apply to him. There is a peculiarity in the Government and in the business affairs of the whole nation, in this, the union and a co-operation of the foreign element with the aboriginal. Its workings have been harmonious and mutually useful. And while it has been so, it has been the gracious policy of the aboriginal race, in whom was vested the legislative

power, in passing laws of a restrictive character, to apply them exclusively to themselves. It ill becomes the foreigner to complain of this application, and it never could have been the meaning and intent of the framers of the Constitution to exclude from the legislative council the power to pass laws exclusively applicable to Hawaiian subjects, while those laws were in accordance with the spirit and genius of their Constitution. The aboriginal race would have never surrendered this power, because they always have been aware, and more especially at the period when the Constitution was adopted, that there were some laws which were regarded as wise for them, which were not applicable to foreigners, or at least would tend to promote difficulties, even if not in conflict with treaty stipulations.

A law containing this prohibition of sale to native subjects was passed by a legislative council, composed mainly, in the House of Representatives, of aboriginal inhabitants, elected by the suffrages of the people ; and in the House of Nobles, by the high chiefs of the land, together with the Ministers, and finally approved by his Majesty the King. The law is the result of the deliberations of those who represent the aboriginal race, and it is sought to be defeated by a resident British subject on the special ground that the native is deprived of his constitutional rights in being under a prohibition to purchase ardent spirits at his hotel. The law has been in operation many years, and the native population sustain it on the ground that it is necessary for the health and lives of the people. While we as a Court are bound by the terms of the Constitution and laws, at the same time it is our duty to apply a sound common sense in their interpretation. It is an historical fact that when a foreign population makes a settlement with an aboriginal race, that while they introduce many good customs, they too often introduce many which are injurious, and of all the various tastes which they have introduced which is dangerous to the life of the aboriginal race, none equals that of a love of ardent spirits. It has generally proved fatal to their existence ; and when this very people, aware of the fatal consequences of the unrestricted sale of ardent spirits, enact and re-enact laws for this purpose, it ill becomes the foreign race to take the advantage of a technical and verbal criticism, which the history of their legislation

fully proves is entirely unsound. The importance of some acts of legislation adapted especially to the natives, has always been regarded as promotive of the rights and interests of both, and often necessary. It is becoming less and less so, still there are and have been laws not necessary or desirable in their application to the foreigner, but which have been thought by the King, Chiefs and Representatives of the people themselves, as necessary for the protection and welfare of the native race. While the native population very largely predominates, still, in commerce and general business, the foreigners exert a large influence, and we regard it as the part of wisdom, that the peculiar wants, necessities and dangers of the native subjects should be especially regarded by legislation.

The counsel for the respondent further contended that the law in question is in violation of the 2d and 10th Articles of the treaty with France and this Kingdom, and by parity with all other countries having treaty stipulations with the Hawaiian Government, the substance of which articles, as the counsel allege, are embraced in the following extracts :

ARTICLE 2d. " There shall be reciprocal liberty of commerce between all the territories of the French Empire, in Europe, and those of the Hawaiian Islands, and their respective subjects shall have the right to buy and to sell, of and to whom they please, without any monopoly, contract, or exclusive privilege of sale or purchase, prejudicing or restricting in any manner whatever, their liberty in this respect."

ARTICLE 10th. " It is agreed that the importation and sale of wines and brandies of French origin shall not be prohibited in the Hawaiian Islands."

The first treaty made with France bears date on the 26th of March, 1846, and is in terms the same as that made with the Government of Great Britain of same date. The 6th Article provides that, " French merchandise or goods recognized as coming from the French dominions, shall not be prohibited, nor shall they be subject to an import duty higher than five per cent. *ad valorem.* Wines, brandies, and other spirituous liquors are, however, excepted from this stipulation, and shall be liable to such reasonable duty as the Hawaiian Government may think fit to lay upon them, provided always that the amount of duty

shall not be so high as absolutely to prohibit the importation of the said articles." At this time the digest of the Constitution and laws, and a project of the organic acts, were under consideration by the Nobles and Representatives, among which was a provision imposing a penalty for the sale of spirituous liquors to natives. These acts were approved by the King on the 27th April of the same year.

It is a matter of history that France made great complaint that the laws imposing duties on spirituous liquors were so high, that it was against the spirit of the treaty, but none whatever against the restrictions imposed on the sale to natives.

In December, 1849, the American treaty was negotiated at Washington, and ratified in August, 1850. Article 9th of said treaty gives to the " citizens and subjects of the contracting parties, freedom in the states of the other to manage their own affairs themselves, or commit them to the charge of any one whom they may select. The buyer and seller have the right to bargain together, and to fix the price of any goods or merchandise imported into, or to be exported from the states or dominions of the contracting parties, except in cases where the laws and usages of the country require the intervention of special agents. But nothing contained in this or any other article of the present treaty, shall be construed to authorize the sale of spirituous liquors to the natives of the Sandwich Islands, further than such sales may be allowed by the Hawaiian laws."

In 1850 the statute in question was passed, which imposed additional restrictions on the sale of spirituous liquor and other intoxicating drinks or substances to natives of the Kingdom. The French treaty, by virtue of which the respondent claims the right of sale, was ratified in 1858. This treaty is especially distinguished for its express regard to the laws of each country. For example, Article 2d, which, with Article 10th, the counsel regard as controlling the law in question, declares that " they (the parties) shall have liberty to trade from place to place, under the provisions of the laws. They shall have liberty in their respective territories, to travel or reside, trade by wholesale or retail as native subjects." The whole paragraph, of which the counsel took a part, is in these words : "They

shall have the right to buy and to sell of and to whom they please, without any monopoly, contract or exclusive privilege of sale or purchase, prejudicing or restricting in any manner whatever, their liberty in this respect. They shall be equally free in all their purchases, as well as in all their sales, to fix the price of their goods, merchandise and objects of every kind, both imported and destined for exportation, so long as they comply with the laws and regulations of the country."

It is very clear, as contended for by the counsel for the respondent, that parties have the right to buy and sell of and to whom they please, " so long as they comply with the laws and regulations of the country." This is an express stipulation to that very article, and a controlling part of it. If the position taken by the counsel is sound, Hawaiians can go to Paris, and there " will have the right to buy and to sell of and to whom they please, without monopoly, contract or exclusive privilege of sale or purchase, prejudicing or restricting in any manner whatever their liberty in this respect." This freedom, from the necessities of a license, or of regard for any of the regulations of trade of the place, would be valuable, and it is a mutual grant unknown in the history of treaties. If the counsel, in their construction of this article, had borne in mind an established principle, that every part of a treaty is to be considered, and the intention is to be extracted from the whole, they would see that while the parties had a right to buy and to sell of and to whom they please, only " so long as they comply with the laws and the regulations of the country." The 10th Article contains the further provision " that the parties shall not be subjected, in any of the aforesaid cases, to other charges, taxes or imposts at the Custom House than those to which native subjects are subjected," limiting the interpretation of the article to its own terms, and even excluding for the moment from consideration the object and intent of the whole treaty, and it is clear that the buying and selling must be in conformity to the laws and regulations of the country.

By Article 10th, "It is agreed, that the importation and the sale of wines and brandies shall not be prohibited in the Hawaiian Islands." The rate of duties to be imposed is detailed in this article. The treaty of 1840 contained a provision that

the duties on these articles should not be so high as absolutely to prohibit their importation. France made especial complaint against the duties imposed at that.time, and sought by the new treaty to have them reduced, which was subsequently done by the Legislature ; but it is a matter of political history that they have never made complaints against the restricting provision. By this article, the duties are expressly set forth, and an importation only requires a compliance with its provisions. When the articles are in the country, the sale cannot be prohibited, but must be made according to the laws and regulations of the country. It is not contended that the law works a prohibition, but a restriction or limitation only. The law in question was in force when the treaty was made, and, of course, the contracting parties are supposed to know of this restriction in the sale. Why then, if it was the intention to give the "right to buy and to sell wines of French origin of and to whom they please," was not language employed which imparts that meaning and intention ? There may be limitation or restriction in the sale of an article which by treaty or by the laws it is legal to import and to sell, but there shall be no "prohibition." It is not contended that there is. How then does the law conflict with the treaty in its terms ? The law does not prohibit the sale, but it regulates, controls and limits it. Treaties and other contracts are to be construed according to their intent. "All international treaties," says Grotius, "are covenants, *bona fide*, and are, therefore, to be equitably and not technically construed."

By the French treaty of 1846, it was provided that no duties should be imposed which would prohibit the importation. About the same time, a law was passed by which it was rendered necessary for a person who purchased a license to retail spirituous liquors, to give a bond, with surety in the penal sum of five hundred dollars, that he would not sell or furnish the same to any native subjects of these islands, and by doing so, he not only forfeited the penalty, but his license also. The law in question was passed in 1850. It will be seen therefrom, that this restriction of the sale was for many years prior to the date of the French treaty now in force. Had it been the intent of the contracting parties to remove this restriction, it would not only have been expressed in the 10th Article, but a duty to.

comply with the laws and regulations of this country in buying and selling would not expressly have been imposed by Article 2d. Phillimore says, " that abrogated treaties often furnish a necessary means of construing those which are in force. A due and judicial regard should be had to the occasion which produced them, the subject matter of their stipulation, and the object for which, and the epoch, during which they were contracted."

Article 10th of the treaty in force contains a detailed account of the duties to which the contracting parties agreed. The controversy under the old treaty arose from the amount of duties imposed by the Hawaiian Legislature. It was contended on the part of France, that the duties were so high that they were hostile to the true intent and spirit of the treaty ; and hence she insisted upon the duties being made specific in the treaty itself. While this is particularly done, there is no reference to the restriction imposed upon the sale—this having been in force for the whole existence of the old treaty. If it had not been regarded by France as legitimate and in conformity to the true intent and meaning of the treaty, her Minister would have insisted upon a provision to guard against it in the future.

This Government has treaties with most of the commercial States, and yet no complaint has been made of a violation of their stipulations in this particular. It has never been contended by any party to a treaty, that it was an object to secure a sale of spirituous liquors to native subjects : and the Court do not believe that any civilized nation would entertain such a purpose. That the parties to the French treaty have never given or contended for such a construction, is conclusive evidence that it was not so understood, and that the 10th Article contained no such purpose. It is very clear that the law in question is not in conflict with the language of this treaty ; and it would be a singular technical construction of a treaty to defeat by implication a law of a nation which was regarded as essential to the health and life of its people.

It is considered a sound rule to have regard to the consequences, to the justice or injustice, advantages or disadvantages, which would ensue from affixing a particular meaning to doubt-

Rex *vs.* Joseph Booth.

ful expressions. (2 Phil., 89.) The construction which the Court gives does not depend upon doubtful expressions, but upon the entire absence of any expressions from which a restriction could be inferred. It is not necessary to refer to the consequences of having an unrestricted sale of spirituous liquors ; but if regard is had to the consequences which might result from a defeat of the law, there can be no doubt of the interpretation of the treaty. The law in question was in force when the treaty was ratified, and had been for many years. Even in equity and fair dealing, to permit the sale as when the treaty was made, gives all the advantages the party had a right to expect. All nations who by treaties permit the importation and sale of spirituous liquors, impose such duties for license as they deem proper, and make such other regulations as legitimately appertain to the police power. " The power which every independent nation possesses to regulate its internal commerce, as well as its police, and to direct how, when and where it shall be conducted in articles intimately connected either with public morals or public safety, or the public prosperity," cannot be surrendered by doubtful construction of a treaty stipulation, or by the still more doubtful inferences from its terms. In a case of doubt even, it addresses itself to the political, rather than the judicial department, in the first instance. The material purpose of France in negotiating this treaty was to effect a reduction in the duties on her wines and brandies, and if she regarded that her rights had been violated by this restriction, it is more than probable that she would have entered her complaints. There is no doubt that this construction carries out the full intent and purpose of the contracting parties. It is not in accordance with the general history of nations, in their diplomatic relations, to refrain from asking the execution of the treaty in all advantageous particulars. A treaty is but a contract between two nations, and who can give its true meaning and intent better than themselves. It must contain stipulations, clear and definite, before third parties can take advantage of it, when opposed to the acts and construction of the parties themselves.

There is no injustice done the respondent. When he took the license he knew its conditions. This provision of law has been in force for many years. Under this decision he will

continue to have the same rights of sale by virtue of his license, as it was understood by the contracting parties to it that he would have. But he seeks to extend that license by the claim of a Constitutional right of sale to the whole native population, which the law prohibits, and in reference to which the contract for a license was made. He will continue to enjoy all the advantages for which he contracted and paid, and, equitably, he can claim no more. In saying this, the Court do not controvert the legal principle that he should not be held responsible for the violation of a law which is unconstitutional. I am only adverting to his rights in *foro conscientiæ*.

My associate has ably presented the whole case, and I shall not advert to other points raised by the counsel for the respondent, for I fully accord with the legal exposition of them made by Justice Robertson.

Judgment of the Police Court affirmed.

Attorney-General Harris, for the Crown.

Mr. Gregg and Mr. Montgomery, for the defendant.

March, 1863.